[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Edward and Martin April invented an improved "gearless transmission" (the transmission)[1]. In April 1994 they applied for a patent, and in August 1995, it was awarded by the U.S. Patent Office. They promptly assigned it to the defendant April Engineering Corporation (AEC), which is solely owned by Edward April and Martin April, his son.[2]
The Aprils' work on this invention began in late 1991, when the services of AEC were retained by Carlyle Johnson Machine Company, CT Page 2176 Inc. (Old Carlyle), a corporation which went bankrupt in 1994. Old Carlyle was taken out of bankruptcy by the plaintiff (New Carlyle), the principals of which are Michael Gamache and Donald Kennett. This case asks the question, Who is or, more exactly, who should be the owner of the gearless transmission patent which Messrs. April obtained and assigned to AEC?
This case was tried to the court on portions of nine days over the course of two months.[3] The parties testified at length, as did many other witnesses, and I had ample opportunity to assess their credibility. The facts which are recited in this memorandum represent my findings of fact, based on the testimony I heard, my evaluation of the credibility of the parties and the other witnesses and my examination of the exhibits introduced into evidence.
New Carlyle's claim to the patent is based on the provisions of a consulting services agreement[4] (the contract) entered into between AEC and Old Carlyle. Paragraph six provides, in pertinent part, that AEC:
 agrees to and does hereby grant and assign to [Old Carlyle] . . . the entire right, title and interest in and to ideas, information, inventions and improvements coming within the scope . . . of this agreement, together with any and all domestic and foreign patent rights, and other intellectual property fights such as ideas, information, inventions and improvements.
In brief, New Carlyle claims that the intellectual property in the gearless transmission invention and the patent are assets to which it gained the rights by virtue of the reorganization plan by which it took Old Carlyle out of bankruptcy.[5] Although this is the essence of the plaintiff's position, its complaint espouses several legal theories on the basis of which it requests relief, each of which will be dealt with in this memorandum.
AEC claims that the contract had been materially breached by Old Carlyle in 1993, prior to the development by the Aprils of the ideas that form the basis of AEC's patent. Therefore, AEC claims that Old Carlyle had no right to the intellectual property or the patent, and the plaintiff cannot succeed to the ownership of property its predecessor never owned. Several special defenses are also asserted, the most serious of which is a claim that, because New Carlyle never raised the issue of ownership of the patent or the intellectual property fights before the Bankruptcy CT Page 2177 Court, it is barred by res judicata or by judicial estoppel from raising that issue now.
There are, therefore, two determinative issues underlying this dispute: 1) Did Old Carlyle materially breach its contract with AEC so that there was no surviving contract right for New Carlyle to take the patent as one of the assets of Old Carlyle in the bankruptcy proceedings?[6] 2) Is New Carlyle barred by the doctrines of res judicata or judicial estoppel from laying claim to the patent held by AEC when it failed to raise the issue of its proper ownership of the patent before the Bankruptcy Court?
I. Did Old Carlyle materially breach its contract with AEC sothat there was no surviving contract fight for New Carlyle, theplaintiff herein, to take the patent as one of the assets of OldCarlyle in the bankruptcy proceeding?
 The Facts
An informal arrangement through which Edward April began working with Old Carlyle in 1991 was superseded by a written consulting services agreement (the contract) signed by AEC and Old Carlyle in March 1992. According to the contract, AEC would assist Old Carlyle in developing and patenting the transmission. Through March 1993, AEC and Old Carlyle worked amicably together for the most part, and Old Carlyle paid AEC's bills, totaling about $48,500. Delays in payment began to occur, however, as early as April 1992, and bills submitted in January and February 1993, were not paid until April and May 1993, respectively. These bills amounted to $15,920 in addition to the bills paid through March 1993. The delays in payment were due to financial difficulties being experienced by Old Carlyle.[7]
In March 1993, the arrangement was renewed for another year, neither party having terminated it in accordance with a clause in the contract (¶ 69) requiring thirty days written notice.
AEC continued rendering services under the renewed contract, but Old Carlyle stopped paying its bills. From April through September 1993, AEC billed $28,800, none of which was paid by Old Carlyle. Edward April testified at trial that he considered the contract breached in September 1993 because of Old Carlyle's nonpayment; at another point in the trial, however, he testified that he considered it breached in May 1993.[8] Whatever may have been Edward April's actual state of mind on this subject, it CT Page 2178 was not until December 1993 that he let anyone at Old Carlyle in on his belief that the contract had been breached, when he told the president of Old Carlyle, Siebert Armstrong, that he was no longer working for Old Carlyle because of the nonpayment of AEC's bills. Soon thereafter, Old Carlyle began making installment payments of $1000 on the amount owed and paid a total of $8000 through March 1994. AEC accepted all of these payments. It is undisputed that AEC never gave Old Carlyle the thirty day written notice to terminate, as required under the contract.
In April 1994, Old Carlyle filed for bankruptcy. AEC filed a claim in bankruptcy for the unpaid billings from 1993, totaling $19,360, and, as part of the bankruptcy settlement, accepted payment of $4,313 in full settlement of its claim. In summary, AEC billed a total of $93,230 for its services under the contract; it was paid $72,430 by Carlyle (78 percent of the billings)[9], and it received an additional $4,313 (22 percent of its claim) in the bankruptcy proceeding.
During 1993, while its bills were not being paid, AEC nevertheless continued working on the joint project. From April 1993 to June or July 1993, AEC produced four draft patent applications. All of these applications were drafted by Edward April, and each provided that Old Carlyle was to be the owner of the patent. The services rendered by AEC during this period were the basis of its claim in the bankruptcy proceeding. As late as September 1993, it was cooperating with Old Carlyle's patent attorney, sending him what was effectively a fifth draft with a fax message, authored by Edward April, to "keep the ball rolling." In October 1993, Martin April was requesting a meeting with Old Carlyle officials to discuss "the progress of the patent."[10] Still later, in November 1993, Edward April prepared promotional material for Old Carlyle referring to its "gearless transmission."[11]
In December 1993, however, Edward and Martin April began preparing to submit their own patent application for the gearless transmission.[12] In January 1994, they retained an attorney to prepare a patent application for the same device they had been working on for Old Carlyle and using concepts they had developed in their work for Old Carlyle. Edward and Martin April filed their own patent application in April 1994, and were awarded the patent for the gearless transmission in August 1995.
The Law
CT Page 2179
"The standard of materiality [of contractual breach] must be applied in the light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performances." 669 Atlantic Street Associatesv. Atlantic-Rockland Stamford Associates, 43 Conn. App. 113, 128
(1996). A material as opposed to incidental breach of contract has been aptly described as one that is "so important that it vitiates or destroys the entire purpose for entering into the contract." A. Prete Son Construction v. Madison, Superior Court, judicial district of New Haven at New Haven, Docket No. 3103073 (October 4, 1994, Healey, J.). "It follows from an uncured material failure of performance that the other party to the contract is discharged from any further duty to render performances yet to be exchanged." Bernstein v. Nemeyer,213 Conn. 665, 672-73 (1990).
What was the purpose of the parties in entering into the contract at issue here? What were their expectations?
The contract, itself, discloses that Old Carlyle expected AEC to render "advisory and consulting services relating to the analysis, testing and development of certain mechanical and other concepts, mechanisms and devices proposed by [Old Carlyle]" (P. 1), and to do "all lawful things . . . during and after the term of this Agreement" related to the filing of patent applications. (¶ 6, p. 2) AEC agreed to provide these services to Old Carlyle exclusively. (¶ 4, p. 2) Further, as pointed out above, AEC agreed to assign and did assign, via ¶ 6 of the contract, all intellectual property and patent rights to Old Carlyle. AEC agreed to refrain from using for itself any confidential information of Old Carlyle (¶ 3) and to furnish prompt reports of all ideas conceived during the term of the contract "or which are suggested by or result from any task or work done for or on behalf of [Old Carlyle]." (¶ 5)
What did AEC expect in return for all of the above? "In return for [AEC's] personal consulting services and assignment of ideas, information, inventions and improvements . . . [to Old Carlyle], [AEC] shall be paid . . . at" an hourly rate not specified in the contract but, according to a footnote thereto, is "to be mutually agreed upon or covered by a fixed price task assignment." (¶ 7) AEC also expected to be reimbursed for its reasonable expenses. (Id.) Finally, AEC expected to obtain what our Supreme Court has referred to as "the privilege and the power to CT Page 2180 terminate [the contract] by giving the requisite notice." Zullov. Smith, 179 Conn. 596, 600 (1980).
It is clear from the exact language of the contract that the expectations of the parties were that AEC would be paid for its work in developing and patenting "certain mechanical and other concepts, mechanisms and devices." There was no expectation that, under any circumstances, AEC would come to own anything that resulted from its collaboration with Old Carlyle. That was not the purpose of the contract. The contract, with its specific and comprehensive provisions, clearly intended to preserve for Old Carlyle any ownership interest in the results of its cooperative endeavor with AEC.
Thus, applying the "purpose and expectations" test for a material breach leads to the conclusion that Old Carlyle's delay in paying and failing to pay a portion of the billings submitted by AEC should not permit AEC to appropriate for itself the results of that collaboration.
In an effort to give more specific content to the concept of a material as opposed to incidental breach of contract, our Supreme Court has adopted the multi-factor standards for materiality of breach contained in the Restatement (Second) of Contracts § 241. See Bernstein v. Nemeyer, 213 Conn. 665, 672, 570 A.2d 164
(1990). "In determining whether a failure to render or offer performance is material, the following circumstances are significant: (a) the extent to which injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for that part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform . . . will suffer forfeiture; (d) the likelihood that the party failing to perform . . . will cure his default; and (e) the extent to which the behavior of the nonconforming party comports with standards of good faith and fair dealing." (Internal quotation marks omitted.) 669 Atlantic Street Associates v. Atlantic-RocklandStamford Associates, supra, 43 Conn. App. 126. Examining these five factors leads to the same conclusion, namely, that there was no material breach of the contract by Old Carlyle.
AEC, the injured party, has not been deprived of a very large percentage of the compensation it expected to receive under the contract, because Old Carlyle paid 78 percent of AEC's billings.[13] AEC never reasonably expected to obtain CT Page 2181 proprietary rights to the product it was developing for Old Carlyle under the contract; rather, AEC assigned all intellectual property and patent rights to Old Carlyle at the outset. While an argument could be made over its adequacy, AEC was compensated in bankruptcy for part of the benefit of which it was deprived. When that payment is added to the direct payments received from Old Carlyle, it turns out that AEC was paid for 82 percent of the billings it submitted. Moreover, as part of its counterclaim in this case, AEC seeks compensation for the time invested and expenses incurred by the Aprils in developing the patent the Aprils ultimately submitted, apparently covering periods of time when AEC was still under contract with Old Carlyle but AEC was not submitting billings.
Old Carlyle will suffer a severe forfeiture if its delay in payment and partial nonpayment is found to be a material breach, because it will lose the intellectual property and patent rights AEC assigned to it pursuant to their contract. Although the exact amount invested by Old Carlyle in the transmission was not established at trial, the evidence shows that the company had been working on the project for several years before AEC came on the scene. In particular, Old Carlyle had invested large amounts of its employees' time and had paid for outside consultant services, such as those rendered by AEC. Also, the evidence shows beyond any question that AEC incurred no expenses for the development of the project beyond the time of its principals, for which it was compensated in the main.
Old Carlyle's payments of monthly installments, from January through March 1994, on AEC's outstanding billings were an attempt by it to mitigate and/or cure its breach. Furthermore, while in bankruptcy proceeding, Old Carlyle assumed its contract with AEC. Finally, Old Carlyle commenced its monthly payments to AEC immediately after it received notice that Edward April, as president of AEC, considered the contract breached, which shows Old Carlyle's good faith in attempting to fulfill its contractual obligations.
Therefore, I find no material breach by Old Carlyle negated AEC's promises in the contract. Nor did AEC avail itself of its "power and privilege" to terminate the contract. AEC could have done so for delayed payments beginning in 1992. It could also have done so for nonpayment during the several months in 1993 when it is undisputed that Old Carlyle was not paying its invoices. CT Page 2182
The contract did not provide that time was of the essence of Old Carlyle's obligation to compensate AEC for its services. Even in cases where it is, a party can waive its right to strict compliance by its acquiescence in delays. Bradley Novelty Co. v.Technomatic, Inc., 142 Conn. 166, 171 (1955). This general principle has been applied to the acceptance of belated payments. "(I)f a party to a contract accepts payments due under it at other times than those contracted for, he thereby waives his right to insist upon a forfeiture for the failure to make the payment and strict accordance with the terms of the contract."Conway v. White, 9 F.2d 863, 870 (2d Cir. 1925). Accord: Bronsonv. Liebold, 87 Conn. 293, 297 (1913). Application of these principles to the conduct of AEC in this case defeats its claim that it was not under a continuing contractual duty to Old Carlyle. AEC's obligations under the contract inured to New Carlyle's benefit when the latter took control of all of the former's assets via the reorganization plan approved by the Bankruptcy Court.
To sum up, "(w)here a contract is broken in the course of performance, the injured party has a choice presented to him of continuing the contract or of refusing to go on. 3 Williston on the Law of Contracts, Rev. Ed., § 683. If the injured party chooses to go on, he loses the right to terminate the contract because of the default." (Citation omitted; internal quotation marks omitted.) Apex Pool Equipment Corp. v. Lee, 419 F.2d 556,562 (2d Cir. 1969). Having made the choice to go on, AEC violated its contract with Old Carlyle by seeking and obtaining a patent in its own name.
At trial, AEC also claimed that the transmission for which it received a patent was significantly different from the device it had worked on for Old Carlyle. Further, AEC claimed it incorporated concepts it had become aware of and incorporated in its design during the period when Old Carlyle was in material breach of the contract. This argument is unavailing. First, Old Carlyle was never in material breach of the contract. Second, the breadth of the assignment language in the contract certainly extended AEC's obligations to the device it had patented; it specifically included in the definition of intellectual property assigned to Old Carlyle "improvements" within the scope of the work to be done under the contract. Lastly, the testimony of John Patterson, which I found credible, established to my satisfaction that the device patented by Edward and Martin April was CT Page 2183 essentially the same as the device on which AEC had been working under the contract.
Indeed, the Aprils, themselves, conceded that the language in their patent application, which was identified by them as describing the key improvement in their transmission, what made it patentable, was identical to the language in the fifth draft patent application forwarded by Edward April to Old Carlyle's patent attorney in September 1993, with his injunction to "keep the ball rolling." They meant for this language and the concept embodied in it to be included by Old Carlyle's patent attorney in the patent application he was preparing, and he did so in an application sent to Edward April and a representative of Old Carlyle on November 29, 1993.
The patent rights to the transmission invented by Edward and Martin April had been assigned to Old Carlyle when the contract was executed in March 1992. It was a violation of that contract for them to obtain a patent for it in their own name and assign it to AEC.[14]
II. Is New Carlyle barred by the doctrines of res judicata orjudicial estoppel from laying claim to the patent held by AECbecause it failed to raise the issue of its proper ownershipbefore the Bankruptcy Court?
 The Facts
With one important exception, the facts underlying this question are not substantially in dispute. In April 1994, Old Carlyle filed for reorganization under Chapter 11 of the Bankruptcy Code. Old Carlyle did not include any reference to its intellectual property rights in the gearless transmission in the required schedule of its assets.
A few days after Old Carlyle filed for bankruptcy, Edward April filed for his patent. Shortly thereafter, Edward April filed a claim in the Bankruptcy Court for payment of moneys due him by Old Carlyle under the contract.[15] Edward April became one of two active members of the creditors' committee, communicating frequently with the committee's attorney and meeting on at least two occasions with Messrs. Gamache and Kennett.[16] Edward and Martin April obtained their patent in August 1995, while the reorganization proceeding was still pending. At no time during that proceeding did Edward April tell anyone, except Siebert CT Page 2184 Armstrong, Old Carlyle's president, that Martin April and he had applied for a patent in their names, and neither Edward nor Martin April told anyone that they had obtained the patent and had assigned it to AEC.
New Carlyle entered the picture in late 1994, when Mr. Gamache learned of the bankruptcy of his former employer, Old Carlyle.[17] By early 1995, Messrs. Gamache and Kennett had retained counsel to assist them in acquiring Old Carlyle and made a preliminary offer to do so in a letter to the attorney for the creditors' committee, of which Edward April was a member.
The reorganization plan by which New Carlyle became the owner of all of Old Carlyle's assets, including its intellectual property rights in the transmission and the patent[18], was approved by the Bankruptcy Court in April 1996. Edward April, as a member of the creditors' committee, had voted to approve New Carlyle's plan. In December 1996, Edward April accepted payment of AEC's claim, pursuant to that plan.
In the same month, Edward April was contacted by Mr. Kennett, and for the first time Edward April disclosed that AEC was the owner of a patent on the transmission, which Edward and Martin April had obtained while the bankruptcy was pending. Mr. Kennett wrote two conciliatory letters to Mr. April, expressing surprise at that development, asserting New Carlyle's ownership interest in the patent, requesting that it be assigned to New Carlyle as the successor in interest to Old Carlyle and suggesting cooperation between New Carlyle and AEC in further work on the transmission. Mr. April refused those entreaties.
A great deal of evidence was introduced at trial as to the events of the two years while the reorganization was pending. From my point of view, the facts relevant to whether New Carlyle is now barred from asserting a claim to the patent because it made no such claim in the Bankruptcy Court are these. First, Mr. Armstrong and Messrs. Gamache and Kennett were rivals for the business of Old Carlyle in the reorganization proceedings. There was little, if any, communication between the two camps and considerable hard feelings on the part of Mr. Armstrong. Therefore, nothing Mr. Armstrong did or knew should be imputed to the principals of New Carlyle. For example, the latter are not chargeable with Old Carlyle's failure to list its claim of intellectual property in the transmission in Old Carlyle's bankruptcy schedule of assets. Nor are they chargeable with any CT Page 2185 knowledge that Mr. Armstrong had as to Edward April's patent application[19].
Second, Edward April knew, without question, in May 1994, when he received a letter from an attorney on behalf of Mr. Armstrong, that Old Carlyle was asserting its ownership interest in any patent that might be secured for the transmission. This letter followed his disclosure to Mr. Armstrong that he and Martin April had applied for a patent in their names. Thus, from early on in the bankruptcy proceeding and throughout his dealings with Messrs. Gamache and Kennett, Edward April was aware that his and Martin April's claim to the patent was disputed by Old Carlyle, yet Edward April disclosed nothing of this to Messrs Gamache and Kennett.[20]
Third, although Mr. Armstrong, in October 1994, testified at a deposition in the bankruptcy proceeding that Edward April had applied for the patent, the principals of New Carlyle were not present or represented at that deposition, and there was no evidence that they knew of the contents of Mr. Armstrong's testimony while the bankruptcy was pending. Moreover, a careful reading of Mr. Armstrong's testimony would not have disclosed that Edward and Martin April had applied for a patent in theirown names. Mr. Armstrong specifically notes that any patent he might obtain is transferable to Old Carlyle pursuant to their contract.[21]
Finally, a meeting was held in March 1995, attended by Messrs. Gamache and Kennett, at which the possibility that Edward April had applied for a patent was discussed.[22] Although Mr. Gamache testified to having no specific recollection of the meeting, its occurrence is unquestioned and consistent with what happened next, the one event of this two-year period that is in dispute.
What happened next was a two-hour trip by Messrs. Gamache and Kennett to Edward April's home-office in Mystic, Connecticut, for the purpose of determining whether what they heard might be true was, in fact, true. While Mr. April testified that he had little recollection of the content of the meeting and that he could not contradict the testimony of Messrs. Gamache and Kennett, he nevertheless told a story of the meeting as a brief, casual encounter, precipitated by their "happening to be in the neighborhood and deciding to drop in," that I found incredible. Whether Edward April was directly asked and falsely denied that CT Page 2186 he had applied for a patent, which Mr. Gamache asserted and I find to be likely, Edward April clearly never told them that he had and gave misleading information as to the patentability of the transmission, intended to throw Messrs. Gamache and Kennett off the scent. Edward April told them to forget about the transmission, that its value was most uncertain, and that it would take millions to develop it. He never told them what they needed to know; viz., that about a year earlier he and Martin April had applied for a patent in their own names and were awaiting the Patent Office's action on their application.
The Law
The defendants' claim that the doctrine of judicial estoppel bars New Carlyle's action here may be swiftly disposed of by reference to a very recent decision of the Appellate Court. SeeSKW Real Estate Ltd. Partnership v. Mitsubishi Motor Sales ofAmerica, Inc., 56 Conn. App. 1 (1999). "Whether the estoppel be equitable or judicial, both types require misleading conduct by a party that causes another to act based on that conduct." Id., 8.[23] AEC, which pleaded judicial estoppel as a special defense, has the burden of proof, and it has not met it. No conduct of New Carlyle in the bankruptcy proceeding could have misled AEC about any material issue. AEC, in the persons of Edward and Martin April, knew that a patent had been applied for and awarded while the bankruptcy was pending. In addition, AEC knew that Old Carlyle laid vigorous claim to the patent as its asset by virtue of the contract, and that New Carlyle was taking over all of Old Carlyle's assets via the reorganization plan. No conduct of New Carlyle caused AEC to act to its detriment in those proceedings. The only misleading of which I am persuaded was the conduct of the defendant Edward April, president of AEC. In the words of the Appellate Court, there simply is "no factual foundation for applying the doctrine of judicial estoppel." SKW Real Estate Ltd.Partnership v. Mitsubishi Motor Sales of America, Inc., supra,56 Conn. App. 9.
Resolution of the res judicata issue, on the other hand, requires consideration of federal case law applying claim preclusion concepts in a bankruptcy context as well as Connecticut law.
There are many cases in which bankruptcy courts and other federal courts have considered whether res judicata barred the assertion of claims in an action brought after a bankruptcy CT Page 2187 proceeding was completed. Almost all recite the following four "elements" of res judicata:
 "1. A final decision on the merits in the first action by a court of competent jurisdiction;
 2. The second action involves the same parties, or their privies, as the first;
 3. The second action raises an issue actually litigated or which should have been litigated in the first action;
4. An identity of the causes of action."
Sanders Confectionery Products, Inc. v. Heller Financial, Inc.,973 F.2d 474, 480 (6th Cir. 1992), cert. denied, 506 U.S. 1079
(1993).[24]
The confirmation by the Bankruptcy Court of New Carlyle's reorganization plan constitutes a final judgment for res judicata purposes. See Stoll v. Gottlieb, 305 U.S. 165, 170-71, reh'g denied, 305 U.S. 675 (1938). And, it cannot be denied that New Carlyle, as the successful suitor for the business of Old Carlyle, was a party in the bankruptcy proceedings.
The issue of who owns the patent to the transmission was not raised by any party in the bankruptcy proceeding even though there were proceedings available to both New Carlyle and AEC to do so in that forum.[25] Therefore, the question is, Should that issue have been raised by New Carlyle, and does its failure to do so bar its action here?
There are many cases in which litigation has been held to be precluded by a plaintiff's failure to raise an issue in a previous bankruptcy proceeding. In all of those cases there is an element present which was noted by the courts as central to their decisions and which is absent here; viz., knowledge of the claim on the part of the plaintiff. See, e.g., In re Kelley, 199 B.R. 698,701 (B.A.P. 9th Cir. 1996) ("the Kelleys had known about their counterclaims for some time" before confirmation of their plan); In re Heritage Hotel Partnership I, 160 B.R. 374, 376
(B.A.P. 9th Cir. 1993), aff'd, 59 F.3d 175 (9th Cir. 1995) ("the facts of which [the prepetition relationship of the parties] were fully known by the debtor"); Eubanks v. FDIC, 977 F.2d 166, 168
(5th Cir. 1992) ("the Eubankses knew of the claims prior to the CT Page 2188 bankruptcy proceeding"); Micro-Time Management Systems, Inc. v.Allard Smith, No. 91-2260, 1993 U.S. App. LEXIS 859, at *14 (6th Cir. Jan. 12, 1993) (per curiam) ("the Plaintiffs knew about the wrongdoing prior to the confirmation of the plan in this case");Sure-Snap Corp. v. State Street Bank Trust Co., 948 F.2d 869,873 (2d Cir. 1991) ("Sure-Snap had adequate information about the prospective lender liability claims."); Holly's, Inc. v. City ofKentwood, 178 B.R. 711, 714 (U.S.D.C., W.D.Mich., 1995) ("Holly's was aware that there was an issue in the bankruptcy proceeding regarding the real property taxes based upon Kentwood's proofs of claim filed."); In Re Little, 126 B.R.861, 863 (U.S.B.C., N.D.Miss. 1991) ("Although admittedly aware of their dispute with Peoples Bank and/or Eastover, the defendants listed the indebtedness owed to the bank as noncontingent and undisputed.").
In this case New Carlyle did not have adequate information upon which to base a claim to AEC's patent in the bankruptcy proceeding, and New Carlyle did not have it because AEC, through its president, Edward April, concealed that information. It bears repeating that one person and only one person knew that a patent had been granted for the transmission, and that person was Edward April.[26] It is undisputed that he never disclosed that fact to anyone while the bankruptcy was pending.
As held by another Bankruptcy Court case considering the effect of res judicata on a subsequent action, "(t)he doctrine is applied only when the party against whom the earlier decision is being asserted had a full and fair opportunity to litigate the issue in question." (Internal quotation marks omitted.) In reHoffman, 99 B.R. 929, 936 (Bankr. N.D.Iowa 1989). See also Boardof Trustees of Trucking Employees of North Jersey Welfare Fund,Inc. v. Centra, 983 F.2d 495, 504-05 (3d Cir. 1992) ("[defendant] insists that [the plaintiff] should have brought to the court's attention claims of which it was completely unaware . . . [Defendant's] argument is indefensible.") The same principle is recognized in Connecticut. Res judicata and collateral estoppel "express no more than the fundamental principle that once a matter has been fully and fairly litigated, and finally decided, it comes to rest." State v. Ellis, 197 Conn. 436, 465 (1985). Here, New Carlyle did not have a "full and fair opportunity" to litigate the issue of who owns the patent because the only person who knew there was a patent kept that knowledge to himself and did not raise the issue of its ownership through one of the many avenues available to him in the bankruptcy proceedings.[27]
CT Page 2189
Contrasting AEC's inaction vis-a-vis its patent with the actions of Charles Ward (Ward), another creditor of Old Carlyle, concerning his patent for a "check valve" points up the proper way for a claimant to raise the issue of patent ownership in a bankruptcy proceeding. Mr. Ward had assigned his patent to Old Carlyle some years before the bankruptcy, just as had AEC, in return for a financial arrangement by which they each would share in the profits from marketing the check valve. After Old Carlyle filed the chapter 11 petition, Mr. Ward filed a motion in the Bankruptcy Court to force Old Carlyle to assign the patent back to him. The ensuing litigation gave both parties a "full and fair opportunity" to pursue their respective claims and resulted in a detailed resolution of the Ward claim separate and apart from the general class of unsecured creditors, which was explicated at length in New Carlyle's disclosure statement. No such resolution of the AEC patent claim was possible because Edward April did not take advantage of the avenue pursued by Charles Ward or any other avenue available to AEC, and he did not disclose the existence of the patent.[28]
Therefore, applying the "four-element" approach of the federal cases to this dispute, I find that the issue of ownership of the patent was not one that should have been raised by New Carlyle in Old Carlyle's chapter 11 reorganization.[29]
The approach of Connecticut courts appears to be somewhat different from that of the federal courts in that the cases do not specify four "elements" of res judicata. It is clear, however, that a final judgment by a court of competent jurisdiction and identity of parties are necessary prerequisites to its application. See, e.g., Slattery v. Maykut, 176 Conn. 147,156-57 (1978). It is also clear that "a former judgment on a claim . . . is an absolute bar to a subsequent action on the same claim. . . . not only as to every matter which was offered to sustain the claim, but also as to any other admissible matter which might have been offered for that purpose." State v. Aillon,189 Conn. 416, 423-24, cert. denied, Aillon v. Connecticut,464 U.S. 837 (1983). "The claim that is extinguished by the judgment in the first action includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." (Internal quotation marks omitted.)Commissioner of Environmental Protection v. Connecticut BuildingWrecking Co., 227 Conn. 175, 189-90 (1993). CT Page 2190
In one of its most recent decisions considering res judicata, our Supreme Court applied these principles to "claims that have not actually been litigated [in the former litigation]."Delahunty v. Massachusetts Mutual Life Ins. Co., 236 Conn. 582,591 (1996). Our Supreme Court held that "a decision whether to apply the doctrine of res judicata to claims that have not actually been litigated should be made based upon a consideration of the doctrine's underlying policies, namely, the interests of the defendant and of the courts in bringing litigation to a close . . . and the competing interest of the plaintiff in the vindication of a just claim." (Citation omitted.) Id. Moreover, the Court said, "(t)he doctrines of preclusion, however, should be flexible and must give way when their mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies." Id.
Given the facts as presented, I conclude that the interest of New Carlyle in the vindication of its claim to ownership of the patent outweighs AEC's and the court's interest in finality that would be served by according res judicata effect to the order of the Bankruptcy Court confirming New Carlyle's plan of reorganization.
The purpose of a chapter 11 proceeding, such as the one which was concluded here with approval of New Carlyle's reorganization plan, "gives a debtor a breathing spell from paying its creditors, provides it with an adequate opportunity to restructure its liabilities and business operations in anticipation of the fresh start that it receives under 11 U.S.C. § 1141".In re MAI Systems Corp., 178 B.R. 50, 56 (Bankr. D.Del. 1995). A requirement that a debtor raise
 "all claims it possesses before entry of the confirmation order . . . would restrict the ability of the principals of the debtor to focus upon restructuring the debtor, instead forcing the principals to focus their attentions on determining all causes of actions the debtor possesses against third party non-debtor entities. The result would be an obstruction of the entire reorganization process contemplated by Congress."
(Emphasis added.) Id.
If it is not incumbent upon a debtor who initiates a chapter 11 proceeding to raise all such claims, given the superior CT Page 2191 information it has as to the existence of those claims, how much less necessary should it be for a successor in interest like New Carlyle, from whom the information upon which such claims should be based was concealed by AEC in the person of Edward April?[30]
The purpose of this contract action is to explore in depth all of the factual and legal issues implicated in determining who owns the patent. What were the contractual rights of Old Carlyle and AEC? Was there a material breach of the contract by Old Carlyle? If so, what are the consequences of that breach? Is the transmission for which AEC holds a patent sufficiently related to the work done by AEC under the contract so as to be covered by the assignment clause of the contract? What is the full scope of the remedies available to New Carlyle, if any, for AEC's obtaining the patent? What is AEC entitled to from New Carlyle, if anything, for its work in obtaining the patent? To require New Carlyle to have raised these questions in Old Carlyle's bankruptcy proceeding or be forever barred would not further the purposes of a chapter 11 proceeding and would preclude a careful exploration of these issues in the appropriate state forum.
This might be a different case if New Carlyle's principals had intentionally sought to conceal their possible claim to the patent and its potential value from Old Carlyle's creditors. AEC has not borne its burden on this special defense to prove that was the case. In fact, the evidence is to the contrary. As early as February 1, 1995, when New Carlyle's attorney in the reorganization communicated its first offer to take the company out of bankruptcy to the attorney for the creditors' committee (of which Edward April was an active member), he listed among the assets that would be purchased "(a)ll intellectual property of the Debtor, including without limitation all patents (assigned and pending). . . . "[31] Moreover, in its business plans, circulated to all creditors in 1994 and again in 1995, New Carlyle made specific reference to a "new product" developed by Old Carlyle in the form of "a potentially revolutionary speed reducing device."[32] It is not without significance that, in New Carlyle's business plans there is no claim that a patent had been applied for, as there was in the Old Carlyle business plan. This demonstrates to me, as Messrs. Gamache and Kennett testified, that they doubted Mr. Armstrong's claim in his business plan that such a patent had been applied for, and that they were relying on Edward April's representation to the contrary when they prepared their own business plan. CT Page 2192
I conclude, to paraphrase the Delahunty Court, "that the policy considerations commonly advanced to justify the doctrine of res judicata are not compelling in this context and that it would be an inappropriate application of the principles of res judicata to require" all contract actions based on claims arising between successors in interest to debtors in chapter 11 proceedings and the creditors of those debtors to be litigated in the chapter 11 proceeding. See Delahunty v. Massachusetts Mutual Life Ins. Co.,
supra, 236 Conn. 592. There is simply not "the duplication that the doctrine of res judicata was aimed at preventing." Id., 593; see also Milford v. Andresakis, 52 Conn. App. 454, 465, cert. denied, 248 Conn. 922 (1999).
This approach of the Connecticut Supreme Court comports with the U.S. Supreme Court's caution against misuse or casual application of the res judicata doctrine:
 "Because res judicata may govern grounds and defenses not previously litigated . . . it blockades unexplored paths that may lead to truth. For the sake of repose, res judicata shields the fraud and the cheat as well as the honest person. It therefore is to be invoked only after careful inquiry."
Brown v. Felsen, 442 U.S. 127, 132 (1979). Careful inquiry leads me to conclude that New Carlyle's claim to ownership of the patent for the transmission is not precluded by its failure to raise it in the chapter 11 proceeding.
III. AEC's Other Defenses
AEC's argument that res judicata and judicial estoppel barred New Carlyle's claim here constituted its ninth special defense to the complaint.[33] The remaining eight special defenses require less attention.
The first defense, that in the bankruptcy Old Carlyle had rejected its contract with AEC as an "executory contract" and, therefore, there were no contract rights for New Carlyle to take out of bankruptcy, was ruled on by the court, Holzberg, J., in denying AEC's first motion to dismiss. Nothing developed in the evidence at trial causes me to deviate from that ruling as the law of the case.
The second, fourth and fifth special defenses are disposed of CT Page 2193 by my conclusion (see Part I, supra) that Old Carlyle was not in material breach of its contract with AEC, and that AEC was obligated by the contract to assign any patent it acquired to Old Carlyle and, by virtue of the reorganization plan, to New Carlyle.
I do not subscribe to the legal position espoused by the third special defense concerning CUTPA liability. See Part IV, infra.
The sixth special defense, "that the complaint fails to state a cause of action against the defendants," does not warrant any consideration.
The seventh and eighth special defenses, asserting estoppel and laches based on the conduct of Old Carlyle, do not constitute defenses to these claims by New Carlyle.
IV. New Carlyle's Causes of Action
New Carlyle asserts six separate causes of action on which it claims a right to recover for AEC's actions.[34] Plainly, it is entitled to recover on its breach of contract count, based on my findings and conclusions in Part I, supra.
New Carlyle also claims that AEC breached the covenant of good faith and fair dealing which was implied in its contract with Old Carlyle. "Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." (Internal quotation marks omitted.) Gaudio v.Griffin Health Services Corp., 249 Conn. 523, 564 (1999); see also Habetz v. Condon, 224 Conn. 231, 238 (1992); 2 Restatement (Second), Contracts § 205 (1979).
"The phrase `good faith' is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving `bad faith' because they violate community standards of decency, fairness or reasonableness." (Internal quotation marks omitted.) Warner v.Konover, 210 Conn. 150, 155 (1989). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or CT Page 2194 deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested and sinister motive . . . Bad faith means more than mere negligence, it involves a dishonest purpose." (Citation omitted; internal quotation marks omitted.) Habetz v. Condon, supra, 224 Conn. 237.
Having assigned all of its patent rights to Old Carlyle in return for the payments specified in the contract, and having accepted payments under the contract totaling 78 percent of its billings, AEC, in the person of its president, Edward April, nevertheless applied for and received a patent for the transmission on which it had worked under the contract.[35] AEC concealed from everyone except Mr. Armstrong, president of Old Carlyle, its application for the patent. Edward April, if he did not flat out deny that he and Martin April had applied for a patent when asked by Mr. Gamache, did everything he could to discourage Messrs. Gamache and Kennett as to its patentability and from pursuing development of the transmission. For the eight months from August 1995, when the patent was awarded, to April 1996, when New Carlyle's reorganization plan was approved by the Bankruptcy Court, AEC concealed the fact that it had actually obtained the patent from everyone. AEC did this knowing that Old Carlyle claimed the patent as its own and that New Carlyle was taking all of Old Carlyle's assets via the reorganization. Thereafter, when Edward April finally disclosed to Mr. Kennett, in December 1996, that he and Martin April had received a patent in their own names and assigned it to AEC, Edward April consistently rebuffed all attempts by New Carlyle to obtain the patent from AEC.
I am satisfied that these findings add up to "more than mere negligence" and show "an interested and sinister motive" on the part of Edward April. Accordingly, the plaintiff is entitled to recover on count two of the complaint.
New Carlyle seeks damages for conversion of its patent. "[C]onversion is an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights." (Citation omitted; internal quotation marks omitted.) Lawson v. Whitey's Frame Shop,42 Conn. App. 599, 606, cert. granted, 239 Conn. 929 (1996), rev'd in part on other grounds, 241 Conn. 678 (1997). "In addition, conversion requires that the owner be harmed as a result of the unauthorized act." Id. There can be no question that AEC converted the patent CT Page 2195 rights New Carlyle took from Old Carlyle via the confirmation of its reorganization plan, nor can there be any question that AEC's continuing to withhold the patent from New Carlyle has resulted in damage to the latter from its inability to further develop this technology.[36]
Whether or not the defendants Edward and Martin April, individually, are guilty of civil theft, under C.G.S. §52-564, is a closer question. The standard of proof is by "clear and convincing evidence." While an objective look at the evidence here makes it clear that AEC had no valid claim of right to the patent, I cannot conclude from the evidence that the Messrs. April did not entertain a view, however wrongheaded, that Old Carlyle's failure to pay them over a protracted period of time entitled them to pursue the patent on their own. Their actions were surely reckless and unscrupulous. But, I do not think New Carlyle has met its burden of showing that the Messrs. April did not operate under an "honestly held claim of right." See Lawsonv. Whitey's Frame Shop, 42 Conn. App. 599, 606 (1996). Therefore, New Carlyle cannot recover under count four of its complaint.
Count five alleges a violation of the Connecticut Unfair Trade Practices Act (CUTPA). "No person shall engage in . . . unfair or deceptive acts or practices in the conduct of any trade or commerce." General Statutes § 42-110b (a). "Any person who suffers any ascertainable loss of money or property . . . as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages." General Statutes § 42-110g (a).
"Trade or commerce" in the Act is defined to include a transaction such as the consulting services contract in this case. General Statutes § 42-110a (4).[37] While a number of Superior Court decisions have held that a CUTPA cause of action does not lie from a simple breach of contract, absent aggravating circumstances, "a violation of CUTPA may be established by showing . . . an actual deceptive practice. . . ." (Internal quotation marks omitted.) Cheshire Mortgage Service, Inc. v.Montes, 223 Conn. 80, 106 (1992). See also Lester v. ResortCampgrounds International, Inc., 27 Conn. App. 59, 71-72 (1992). As demonstrated in the discussion above of count one, Edward April engaged in just such deceptive practices in this case.
There has also been a debate among Superior Court judges, carried on through opinions in individual cases, over whether a CT Page 2196 single unfair or deceptive act, as opposed to a pattern of such acts, can give rise to a CUTPA violation. See generally, HaydenMachinery, Inc. v. Stonecrafters, Inc., Superior Court, judicial district of New Haven at Meriden, Docket No. 249141 (October 12, 1995, Silbert, J.). In this case, however, AEC engaged in a pattern of deception throughout the course of the bankruptcy proceeding both before and after it obtained the patent.[38]
"[I]n order to prevail in a CUTPA action, a plaintiff must establish both that the defendant has engaged in a prohibited actand that, `as a result of' this act, the plaintiff suffered an injury." (Emphasis in original.) Abrahams v. Young and Rubicam,Inc. 240 Conn. 300, 306 (1997). A prohibited act is one which is, inter alia, "immoral, unethical, or unscrupulous." Larsen ChelseyRealty Co. v. Larsen, 232 Conn. 480, 507 (1995). I believe that my description of AEC's conduct in earlier parts of this memorandum demonstrates that its conduct was at least "unethical" and "unscrupulous."
New Carlyle must also have shown an "ascertainable loss" to maintain an action under CUTPA. This requirement has been described as "a threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or equitable relief." (Internal quotation marks omitted.)Service Road Corp. v. Quinn, 241 Conn. 630, 638 (1997). "An ascertainable loss is a deprivation, detriment or injury that is capable of being discovered, observed or established. . . . A loss is ascertainable if it is measurable even though the precise amount of the loss is not known. . . . Under CUTPA, there is no need to allege or prove the amount of the ascertainable loss . . . A plaintiff need not prove a specific amount of actual damages in order to make out a prima facie case under CUTPA." (Citations omitted; internal quotation marks omitted.) Id., 638-39.
At least since January 1997, when its principals requested assignment of the patent to New Carlyle and were rebuffed, the plaintiff has suffered the loss of the opportunity to develop and market the transmission. I consider that sufficient to meet the requirement of an "ascertainable loss" under CUTPA.
New Carlyle's final cause of action is a common law one for damages based on "wilful and wanton conduct" on the part of AEC.[39] "Wanton misconduct is reckless misconduct." (Internal quotation marks omitted.) West Haven v. Hartford Ins. Co.,221 Conn. 149, 160 (1992). "It is such conduct as indicates a CT Page 2197 reckless disregard of the just rights or safety of others or of the consequences of the action." (Internal quotation marks omitted.) Elliott v. Waterbury, 245 Conn. 385, 415 (1998).
 "Recklessness is a state of consciousness with reference to the consequences of one's acts. . . . It is more than negligence, more than gross negligence. . . . The state of mind amounting to recklessness may be inferred from conduct. But, in order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . . Wanton misconduct is reckless misconduct. . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action."
(Citations omitted; internal quotation marks omitted.) Dubay v. Irish,
supra, 207 Conn. 518, 532 (1988).
AEC's conduct in this case, as spelled out in my consideration of New Carlyle's claim for breach of the covenant of good faith and fair dealing and its claim of a CUTPA violation, qualifies as reckless and, therefore, wanton conduct and entitles New Carlyle to damages under this count.
In summary, I find for the plaintiff, New Carlyle, on counts one, two, three, five and seven of the complaint. I find for the defendants, Edward and Martin April, on count four.
Consideration of damages was postponed by agreement of the parties until after the allegations of the complaint were considered. Nevertheless, my findings for New Carlyle on the counts of the complaint listed above compel the injunctive relief prayed for in its complaint. Accordingly, it is ORDERED:
1. That AEC assign the patent to New Carlyle within three weeks of the date of this memorandum;
2. That, pending AEC's compliance with this order, AEC and Edward and Martin April are enjoined from assigning the patent to any other person or entity, licensing its use by any other person or entity or making use of the patent in its business operations;
3. That, pending resolution of the issues raised by AEC's counterclaim, New Carlyle is enjoined from assigning or licensing others to use the patent and from using it in its own business CT Page 2198 operations.
The court presumes to suggest that, now that the issues of liability on the complaint have been resolved, the parties should enter into negotiations concerning a possible settlement of the remaining issues. The court will not schedule a hearing on those remaining issues for thirty days from the date of this memorandum to facilitate such negotiations.
BY THE COURT
Shortall, Judge.